**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 15 2024

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

FISHER-PRICE, INC. and MATTEL,
INC.,

              **Petitioners,**

v.

**UNIVERSITY OF ARKANSAS FOR
MEDICAL SCIENCES**

              **Respondent.**

**Civil Action File No.:** *4:24 mc001 - KGB*

**(Related to Civil Action No. 1:22-cv-10984
D. Mass.)**

<u>**BRIEF IN SUPPORT OF PETITIONERS FISHER-PRICE, INC.'S AND MATTEL,
INC.'S MOTION TO COMPEL THE UNIVERSITY OF ARKANSAS TO PRODUCE
MATERIAL RESPONSIVE TO SUBPOENA**</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ......................................................................... 4

    I.      The CPSC Commissioned Study Conducted by Dr. Mannen................................. 4

            a.      Incident Report Analysis.......................................................................... 4
            b.      Product Analysis ....................................................................................... 5
            c.      *In Vivo* Biomechanics Study................................................................... 6
            d.      Inconsistencies Between Dr. Mannen's 2019 CPSC Study and
                  Subsequent Work ..................................................................................... 7

    II.     The *Colon* Plaintiffs' Allegations and Expert Disclosure of Dr. Mannen............. 9
    III.    Petitioners' Efforts to Obtain Materials On Which Dr. Mannen Relies.............. 10

            a.      Requests to *Colon* Plaintiffs' Counsel ..................................................... 10
            b.      Freedom of Information Act (FOIA) Requests to The CPSC.................. 11
            c.      Petitioners' Subpoenas to the University of Arkansas............................. 11

JURISDICTION AND STANDARD .................................................................................. 13

ARGUMENT ....................................................................................................................... 13

    I.      The Requested Materials Are Relevant and Discoverable, and The
          University Does Not Dispute This Point. .............................................................. 13
    II.     The University Has Not Met Its Burden to Establish that the Requested
          Materials are Confidential...................................................................................... 14
    III.    Petitioners Have a Substantial Need for The Requested Materials. ..................... 18
    IV.    Any Alleged Confidentiality Concerns Are Resolved by the *Colon*
          Protective Order, Which Allows for the Requested Materials to be Kept
          Confidential........................................................................................................... 21

CONCLUSION.................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A Major Difference, Inc. v. Wellspring Products, LLC,*
    243 F.R.D. 415 (D. Colo. 2006) ............................................................19

*Adams v. TDC Gen. Contrs. LLC,*
    No. 4:22-cv-04110, 2023 U.S. Dist. LEXIS 179306 (W.D. Ark. Oct. 4, 2023)......................15

*Baxter Int'l, Inc. v. Abbott Lab.,*
    297 F.3d 544 (7th Cir. 2002) ...............................................................15

*BSN Medical, Inc. v. Parker Medical Associates, LLC,*
    2011 U.S. Dist. LEXIS 4833, 2011 WL 197217 (S.D.N.Y. Jan. 19, 2011) ...........................18

*Burton v. Valmet, Inc.,*
    No. 4:13-cv-00073 KGB, 2015 U.S. Dist. LEXIS 183459 (E.D. Ark. Feb. 24,
    2015) ..................................................................................14

*Cave v. Thurston,*
    No. 4:18-cv-00342-KGB, 2022 U.S. Dist. LEXIS 179202 (E.D. Ark. Sep. 30,
    2022) ..................................................................................22

*City of Owensboro v. Ky. Utils. Co.,*
    2008 WL 4542674 (W.D. Ky. 2008) ........................................................20

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
    447 U.S. 102 (1980)....................................................................17

*Cusumano v. Microsoft Corp.,*
    162 F.3d 708 (1st Cir. 1998)...........................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993)......................................................................2

*Diamond State Ins. Co. v. Rebel Oil Co., Inc.,*
    157 F.R.D. 691 (D. Nev. 1994)..........................................................17

*Dinosaur Merch. Bank Ltd. v. Bancservices Int'l LLC,*
    No. 19-CV-84-ACL, 2021 U.S. Dist. LEXIS 47226, 2021 WL 918189 (E.D.
    Mo. March 10, 2021) ...................................................................13

*Dish Network, L.L.C. v. WNET,*
    Civil Action No. 13-cv-00832-PAB-KLM, 2014 U.S. Dist. LEXIS 57281 (D.
    Colo. Apr. 24, 2014) ..................................................................14

*I-Enterprise Co. v. Draper Fisher Jurvetson Mgt. Co.,*
    No. C-03-01561 MMC (EDL), 2005 U.S. Dist. LEXIS 57817 (N.D. Cal. Sep.
    15, 2005) ...........................................................................16, 18

*Longoria v. Kodiak Concepts LLC,*
    No. CV-18-02334-PHX-DWL, 2021 WL 1100373 (D. Ariz. Mar. 23, 2021) ..................19, 21

*Mannington Mills v. Armstrong World Indus., Inc.,*
  206 F.R.D. 525 (D. Del. 2002) ................................................................................. 19

*In re New Eng. Compounding Pharmacy, Inc.,*
  No. MDL No. 13-2419-FDS, 2013 U.S. Dist. LEXIS 161652 (D. Mass. Nov.
  13, 2013) .................................................................................................................. 22

*Richards of Rockford, Inc. v. PG&E,*
  71 F.R.D. 388 (N.D. Cal. 1976) ............................................................................... 15

*Scientific Games Corp. v. AGS LLC,*
  No. 2:17-cv-00343-JAD-NJK, 2017 U.S. Dist. LEXIS 136592 (D. Nev. Aug.
  24, 2017) .................................................................................................................. 15

*Solar X Eyewear, LLC v. Bowyer,*
  No. 1:11-cv-763, 2011 U.S. Dist. LEXIS 100421 (N.D. Ohio Sep. 7, 2011) ........... 15

*Spartanburg Reg. Healthcare, Sys. v. Hillenbrand Indus., Inc.,*
  2005 U.S. Dist. LEXIS 30594, 2005 WL 2045818 (W.D. Mich. 2005) .................. 19

*StoneEagle Servs. v. UMB Bank, N.A.,*
  No. 4:15-mc-0904-NKL, 2015 U.S. Dist. LEXIS 66863 (W.D. Mo. May 22,
  2015) ....................................................................................................................... 22

*The Hunte Corp. v. Martinelli,*
  2010 U.S. Dist. LEXIS 122863, 2010 WL 4813849 (W.D. Mo. Nov. 19,
  2010) ....................................................................................................................... 22

*U.S. Surgical Corp. v. Orris, Inc.,*
  983 F. Supp. 963 (D. Kan. 1997) ............................................................................. 20

*United States v. Proctor & Gamble, Co.,*
  356 U.S. 677 (1958) ................................................................................................ 13

*Universal Del., Inc. v. Comidata Network, Inc.,*
  Case No. 10-mc-104, 2011 U.S. Dist. LEXIS 28963, 2011 WL 1085180
  (M.D. Tenn. Mar. 21, 2011) ..................................................................................... 19

*Upjohn Co. v. Hygieia Biological Labs.,*
  151 F.R.D. 355 (E.D. Cal. 1993) ............................................................................. 17

*Velali v. Yale Univ.,*
  2020 WL 5790443 (D. Conn. 2020) ........................................................................ 20

*Widevoice Communs. v. Qwest Communs. Co.,*
  No. 2:12-cv-00467-GMN -VCF, 2012 U.S. Dist. LEXIS 58248 (D. Nev. Apr.
  26, 2012) .................................................................................................................. 22

*XTO Energy, Inc. v. ATD, LLC,*
  No. 14-1021 JB/SCY, 2016 U.S. Dist. LEXIS 57050, 2016 WL 1730171
  (D.N.M. Apr. 1, 2016) ............................................................................................. 13

**Federal Statutes**

15 U.S.C. § 2055 ............................................................................................. 2, 16, 18

15 U.S.C. § 2055(a)(2)................................................................................17

15 U.S.C. § 2055(d)(2) ...............................................................................17

**Rules**

Fed. R. Civ. P. 26.............................................................................2, 3, 18

Fed. R. Civ. P. 26(a)(2)(B)(ii)....................................................................14

Fed. R. Civ. P. 26(b)(l)...............................................................................13

Fed. R. Civ. P. 34(c)...................................................................................13

Fed. R. Civ. P. 45(a)(1)(iii).........................................................................13

Fed. R. Civ. P. 45(d)...................................................................................13

Fed. R. Civ. P. 45(d)(3)(B)(i) ................................................2, 11, 14, 15, 16, 18

Fed. R. Evid. 702....................................................................................2, 3, 18

Petitioners Fisher-Price, Inc. ("Fisher-Price") and Mattel, Inc. ("Mattel") (collectively, "Petitioners"), pursuant to Fed. R. Civ. P. 45 and 37, as well as Local Rule 7.2, move this Court for an order compelling Respondent University of Arkansas for Medical Sciences (the "University") to comply with a subpoena (the "Subpoena") issued out of the United States District Court for the Eastern District of Arkansas by Petitioners in the underlying litigation pending in the United States District Court for the District of Massachusetts captioned *Colon, et al. v. Fisher-Price, Inc., et al.*, Civil Action No. 1:22-cv-10984 (the "*Colon* case"). In support of this motion, Petitioners state as follows.

## **INTRODUCTION**

This discovery dispute arises from the *Colon* case, in which the plaintiffs allege a Fisher-Price Rock 'n Play Sleeper—an inclined sleep product—was defective and caused the death of their infant daughter. To support their allegations, the *Colon* plaintiffs disclosed Dr. Erin Mannen as an expert witness, who opines that the design of the Rock 'n Play Sleeper causes biomechanical alterations in an infant's body that can lead to positional asphyxia. In support of her opinions, Dr. Mannen relies on a study she conducted in 2018-2019 during her employment at the University, which was commissioned by the U.S. Consumer Product Safety Commission ("CPSC"). The results of her study were summarized into a report to the CPSC in September 2019 (the "2019 CPSC Report") and later included in two separate peer-reviewed articles for the Journal of Biomechanics in August 2020 ("2020 Wang et al.") and August 2021 ("2021 Wang et al.") (collectively, the "Studies"). Despite her reliance on these Studies in her *Colon* expert report, Dr. Mannen claims she cannot produce any of the data or other materials related to them because such material is no longer within her possession or control, and that they are instead within the custody of the University. Petitioners therefore served a subpoena on the University on September 15,

1

2023, seeking this material to evaluate the reliability of Dr. Mannen's opinions rendered in the *Colon* case. (*See* Subpoena, Exh. 1).

After multiple meet and confers with counsel for the University, on December 14, 2023, the University responded to Petitioners' Subpoena and produced approximately 140 documents, but withheld several communications between Dr. Mannen (and her team members) and the CPSC, as well as any other "notes or data developed under the [CPSC] contract or documents that provide names of manufacturers or products that were used during the study," under the claim that such information is confidential pursuant to an agreement between the University and the CPSC and thus protected under Fed. R. Civ. P. 45(d)(3)(B)(i) and 15 U.S.C. § 2055. (*See* Letter from S. Robinson to B. Cox, et al., dated December 14, 2023, attached as Exh. 2). Importantly, the University **does not dispute** the relevance or significance of the materials sought by the Subpoena. Nor does the University object on the grounds of overbreadth or burden. The University **only** objects to the production of the withheld material on the grounds that they are subject to a confidentiality agreement with the CPSC, and the CPSC will not permit the production. (*See id.*).

The University's (and the CPSC's) position to withhold these documents is without merit given Dr. Mannen's choice to serve as a retained expert witness in the *Colon* case, where she relies on the underlying data from her 2019 CPSC Study in her opinions. That choice now subjects Dr. Mannen (and by extension, the University) to the Federal Rules of Civil Procedure—specifically Fed. R. Civ. P. 26—which **requires** Dr. Mannen to provide Petitioners with **all** her underlying data that support (or refute) her opinions. Petitioners are entitled to assess the reliability of Dr. Mannen's opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This is true despite the University's incorrect contention that Dr. Mannen's underlying data is confidential (and therefore cannot be produced)

2

based on the contractual agreement between the University, Dr. Mannen, and the CPSC **before she became a retained expert witness**. Defendants' right to assess and analyze Dr. Mannen's underlying data under Fed. R. Civ. P. 26 and challenge her methodology and conclusions under Fed. R. Evid. 702 outweighs any claim of confidentiality, particularly where—as here—there is a Protective Order in the *Colon* case to ensure the data can be produced confidentially.

The Court should therefore compel the production of Dr. Mannen's communications with CPSC regarding her Studies, her underlying data from the Studies, and any notes from the Studies for the following reasons. *First*, neither the University nor the CPSC has met their burden of establishing the responsive materials are confidential in a case like this in which Dr. Mannen relies on the withheld documents to support her paid expert opinions. To the extent there is concern regarding the disclosure of the identities of testing participants or the manufacturers' products used during testing, that concern can be addressed through limited redactions that still permit Petitioners to obtain the responsive material. *Second*, even if the University or the CPSC could show the documents are confidential (which they cannot), Petitioners' substantial need for the documents to assess the reliability of Dr. Mannen's opinions and otherwise defend themselves in *Colon* outweighs any claim of confidentiality. And *third*, any concerns of confidentiality are immaterial because there is a Protective Order in the *Colon* case under which the material may be designated as "Confidential" by the University or the CPSC—showing that there is a procedure in place to maintain any claimed confidentiality over the withheld documents.

Petitioners therefore respectfully request the Court compel the production of the withheld documents pursuant to Petitioners' Subpoena.

## **RELEVANT FACTUAL BACKGROUND**

**I.     The CPSC Commissioned Study Conducted by Dr. Mannen**

On September 18, 2019, Dr. Mannen—then an Assistant Professor at the University—released the manuscript of a study commissioned by the CPSC, which purported to analyze the safety of inclined sleep products. (*See generally* the 2019 CPSC Report, Exh. 3). The study consisted of three different analyses: (1) an analysis of incident reports related to inclined sleep products to assess "trends, similarities, or differences in the incidents that may inform product safety," (*id.* at 3); (2) an analysis of inclined sleep products to "identify differences in design," (*id.*); and (3) an *in vivo* biomechanics study of infants 2-6 months of age. These analyses were allegedly intended to determine: "(a) the strength and space requirements for infants to move their heads and/or roll from the supine to the prone position in Inclined Sleep Products compared to a Flat Sleep Product; (b) the strength and space requirements for infants to lift their heads and/or roll from the prone to the supine position in Inclined Sleep Products compared to a Flat Sleep Product; and (c) the impact of the tightness of restraints in Inclined Sleep Products to prevent an infant from rolling from the supine to the side or prone position." (Univ. of Ark. Proposal to CPSC, Exh. 4). Dr. Mannen's analyses, and her conclusion stemming from those analyses that she now seeks to provide as expert opinions in *Colon*, are discussed in more detail below.

**a.     Incident Report Analysis**

In the incident report analysis portion of the study, Dr. Mannen and her team at the University were provided with "91 separate incidents reported to or investigated by the CPSC involving an incident (hazard, injury, or death)" in an inclined sleep product. (*Id.* at 4). After reviewing the reports, Dr. Mannen and her team gathered the following data from the reports and organized the data in a spreadsheet:

4

> date of incident, incident (hazard, injury, or death), manufacturer and model, city and state, infant demographics at time of incident (age, sex, race/ethnicity, height, weight), incident details (initial position, found position, time since last checked, found by, restraint used, soft goods found with infant, other items found with infant, room temperature, current medical conditions, usual sleeping position, other notes), birth and pregnancy details (pregnancy concerns, gestational age, maternal age, paternal age, Apgar Score, height, weight, previous medical history), coroner report details (medical findings, cause of death, manner of death, medical notes), conflicting details noted by the team, and other notes of interest.

(*Id.* at 4).

Based on this review, Dr. Mannen and her team organized the incidents into four categories based on the infant's body positions and reached several conclusions that she now provides as an expert witness in the *Colon* case. (*See* Mannen Report, Exh. 5, at 41-46 (incorporating the entirety of the incident report analysis and conclusions from her 2019 CPSC Report)). However, Petitioners do not have access to the 91 incident reports or the spreadsheet prepared by Dr. Mannen analyzing them, which prevents them from analyzing the reliability of the conclusions she draws from these reports.

**b.    Product Analysis**

In the product analysis section of the 2019 CPSC Report, Dr. Mannen states that the CPSC provided the University with "14 different unassembled products that fell into the category of 'Inclined Sleep Product.'" (2019 CPSC Report, at 10, Exh. 3). Dr. Mannen and her team then proceeded to conduct various measurements of the 14 different inclined sleep products and noted significant variation in their features, including but not limited to their width, incline angles, and functionality. (*Id.* at 17). After narrowing the number of products to be used in the *in vivo* biomechanics portion of the study, Dr. Mannen and her team conducted a "contact area analysis" on the products to measure deformation of the products using pressure from a 2-kilogram weight gage. (*Id.* at 19-20). The data was collected through pressure-mapping sensors and analyzed

5

through a computer coding program called MATLAB. (*See id.* at 20). In her 2019 CPSC report, most of this data is absent.

Now, Dr. Mannen opines in the *Colon* case that the subject Rock 'n Play Sleeper used by the plaintiffs was "functionally equivalent to inclined sleep products that were tested in [the 2019 CPSC Report], meaning the results of [the 2019 CPSC Report] apply to this specific case." (Mannen Report, Exh. 5, at 3). However, both the 2019 CPSC Report and her *Colon* expert report fail to identify any of the products tested. And both reports also exclude **any** of the raw data collected through the pressure-mapping sensors or the MATLAB codes used to analyze this data. Without this raw data, Petitioners have no way of confirming whether the subject product in the *Colon* case was analyzed and, if so, what the pressure-mapping measurement data was for the product.

c.    *In Vivo* Biomechanics Study

Dr. Mannen and her team also conducted an *in vivo* biomechanics study, where they placed ten infants aged 2-6 months of age in an adjustable crib, as well as 7 of the 14 inclined sleep products provided by the CPSC. (*Id.* at 23-24). Dr. Mannen then proceeded to measure—in pertinent part—each infant's kinematics, muscle activity, and oxygen saturation levels in the following conditions: (1) supine (face-up) in 0-degree/horizontal crib, (2) supine in a 10-degree tilted crib, (3) supine in a 20-degree tilted crib, (4) supine in each of the 7 inclined sleepers tested, (5) prone (face-down) in 0-degree/horizontal crib, (6) prone in a 10-degree tilted crib, (7) prone in a 20-degree tilted crib, and (8) prone in each of the 7 inclined sleepers tested. (*Id.* at 24-29).

The infants' kinematics data was measured using a "marker-based motion capture," where "a set of 10 infrared cameras tracked the position of 21 retro-reflective markers, positioned on specific body segments on the infant, at a sampling rate of 100 Hz." (*Id.* at 26). The infants' muscle activity was measured using surface electromyography (EMG). (*Id.* at 27). And the oxygen

saturation levels were measured "using a commercial grade and a medical grade pulse oximeter." (*Id.*) However, despite Dr. Mannen relying on this data to support her opinions in *Colon*, Petitioners do not have any of the following to assess the reliability of her opinions: (1) the raw kinematics data captured through the cameras and markers; (2) the MATLAB calculations for the results of this analysis; or (3) the EMG readings or oxygen saturation readings for any of the infants.

      **d.**      **Inconsistencies Between Dr. Mannen's 2019 CPSC Study and Subsequent Work**

In 2020, Dr. Mannen left the University of Arkansas and joined Boise State University as an Assistant Professor where she eventually published segments of the 2019 CPSC Report in the Journal of Biomechanics with additional data from 5 additional infants. (*See* Wang et al. 2020, Exh. 6; Wang et al. 2021, Exh. 7). At the conclusion of both of Dr. Mannen's published articles an acknowledgment appears: "This study has been funded with federal funds from the United States Consumer Product Safety Commission under contract number 61320618P," which is a clear reference to the 2019 CPSC commissioned study she completed at the University. (*See id.*).

Despite this acknowledgement, there are several inconsistencies between the data within the 2019 CPSC Report and the published papers. For example, Dr. Mannen provided motion capture and EMG results for the same product identified as "S02" in the 2019 CPSC Report and "sleeper a" in the 2021 Wang et al. study:

 

"S02" in 2019 CPSC Report (*see* 2019 CPSC Report, at 24, Exh. 3).

"sleeper a" in 2021 Wang et al. (*see* 2021 Wang et al., at 3, Exh. 7).

However, the average finding of the neck range of motion of infants while supine in this product were drastically different between the two studies, with the 2019 CPSC Report showing an average of approximately 45 degrees and the 2021 Wang et al. Study showing an average of 20 degrees—suggesting that the average neck range of motion fell by approximately 25 degrees with the addition of five new infants in the 2021 testing:



(2019 CPSC Report, at 40, Exh. 3).                    (2021 Wang et al., at 3, Exh. 7).

The only way these results could make sense—short of a significant error by Dr. Mannen in calculating her results—is if the five new infants in the 2021 testing displayed a *negative* neck range of motion, which is physically not possible. This example is representative of a myriad of

issues that underscore the importance of Petitioners having access to Dr. Mannen's underlying data.

## II.   The *Colon* Plaintiffs' Allegations and Expert Disclosure of Dr. Mannen

On April 5, 2022, the *Colon* plaintiffs filed their action against Petitioners, alleging that the Rock 'n Play Sleeper—an inclined sleep product—was defective and caused the death of their infant daughter. (*See generally Colon* Complaint, Exh. 8). To support their allegations, Plaintiffs disclosed Dr. Mannen as a retained expert witness, who opines that the design of the Rock 'n Play Sleeper causes biomechanical alterations in an infant's body that can lead to positional asphyxia. (*See Colon* Expert Disclosures, Exh. 9).

In her *Colon* report, Dr. Mannen claims that she is "uniquely qualified to serve as a biomechanics expert in this case" because in 2018 to 2019 she conducted a "study funded by the United States Consumer Product Safety Commission" and "led a team of engineers and clinicians to conduct in depth investigation review, product characterizations and a peer reviewed *in vivo* biomechanics research study on 15 living human babies to understand how their body position and movement was impacted by inclined sleep products." (Mannen Report, at 3, Exh. 5).[1] Throughout her report, Dr. Mannen summarizes the conclusions drawn from her "human subjects study" and then proceeds to extrapolate those findings to her opinions in this case. (*See, e.g.*, *id.* at 3 ("[T]he Fisher Price Rock 'n Play Sleeper product is functionally equivalent to inclined sleep products that were tested in my previous human subjects biomechanics study, meaning the results of that robust and peer-reviewed research apply to this specific case."); *id.* ("The methodology and results of my

---

[1] Dr. Mannen explains that her "previous 2018-2019 U.S. CPSC Inclined Sleep Product Study" was divided into "three main parts" including summarizing incident reports, product analysis, and *in vivo* human subjects biomechanics experiment. (*Id.* at 7). In the discussion of the human subjects biomechanics experiment, Dr. Mannen refers to two of her publications in the Journal of Biomechanics as an extension of the work done on behalf of the CPSC. She claims, "[a]s part of the original CPSC study, 10 babies were tested. However my team increased the sample size to 15 babies and have subsequently published those results . . ." (*Id.* at 8).

*in vivo* biomechanics study were therefore used in forming my opinions described in this report."); *id.* at 20 ("the conclusions related to the *in vivo* biomechanics study for this product apply to this specific case.")). Thus, the bases of Dr. Mannen's opinions are firmly rooted in her work done in conjunction with the study funded by the CPSC and the two published articles that followed, including the underlying raw data.

### III.   Petitioners' Efforts to Obtain Materials On Which Dr. Mannen Relies

#### a.   Requests to *Colon* Plaintiffs' Counsel

Petitioners recognized that in order to properly assess the reliability of Dr. Mannen's opinions in the *Colon* case, they must better understand the methodology and objectives of her 2019 CPSC Report and the Wang, et al. 2020 and Wang, et al. 2021 published articles. Therefore, on August 30, 2023, Petitioners sent correspondence to counsel for the *Colon* Plaintiffs requesting that Dr. Mannen produce "all documents and material related to the 2019 CPSC study, as well as the 2020 and 2021 Wang studies conducted by Dr. Mannen, including but not limited to raw data, analyzed data, work papers, notes, communications with the CPSC and others related to the studies, details regarding the incidents relied upon in the CPSC studies, videos, and photographs[.]" (*See* Aug. 30, 2023 Correspondence, Exh. 10).

On September 8, 2023, counsel for the *Colon* Plaintiffs responded that Dr. Mannen "does not have the requested materials in her possession, custody or control, nor is she able to access the data." (*See* Sept. 8, 2023 Email Correspondence, Exh. 11). Counsel further noted that "[t]hese materials are maintained by the University of Arkansas and are subject to contractual confidentiality restrictions." (*Id.*).

10

### b.     Freedom of Information Act (FOIA) Requests to The CPSC

On August 23, 2023, counsel for Petitioners served a FOIA request to the CPSC seeking the same information regarding the Studies. (*See* Aug. 23, 2023 FOIA Request, Exh. 12). After obtaining multiple extensions to respond to the FOIA request, the CPSC provided its final response on November 20, 2023, denying the request because it was overly broad, burdensome, and lacking in specificity. (*See* Nov. 20, 2023, CPSC FOIA Response, Exh. 13). Petitioners disagree with the CSPC's position.

### c.     Petitioners' Subpoenas to the University of Arkansas

Petitioners prepared two Subpoenas to the University. The first Subpoena sought "all contracts or agreements between the University of Arkansas and the CPSC relating to" the 2019 CPSC Report and Wang, et al. 2020 and Wang, et al. 2021 published articles. (*See* Subpoena seeking Contracts or Agreements, Exh. 14). The second Subpoena sought (among other things) all documents, communications, and data regarding the Studies. (*See* Subpoena Seeking Data, Exh. 1). The second Subpoena is the subject of this Motion.

The University accepted service of the Subpoenas on September 15, 2023. (*See* Sept. 15, 2023 Email Correspondence, Exh. 15). On September 27, 2023, the University provided a formal response. (*See* Sept. 27, 2023 Correspondence, Exh. 16). Notably, the University did not dispute the relevance of the materials sought by the Subpoenas. (*See id.*). Nor did the University object on the grounds of overbreadth or burden. (*See id.*). Instead, the University simply claimed that it would not produce anything in response to the subpoena because it deemed that the material sought was protected under Fed. R. Civ. P. 45(d)(3)(B)(i). (*See id.*). The University made no attempts to explain why this narrow exception applied to the requested material other than their agreement with the CPSC to maintain this material as confidential. (*See id.*). Nor did the University file a motion to quash the Subpoena.

11

Petitioners responded to the University on November 13, 2023, and discussed in detail the reasoning as to why the responsive material is discoverable. (*See* Nov. 13, 2023 Correspondence, Exh. 17). The parties engaged in several meet and confers, which resulted in the production of approximately 140 documents by the University on December 14, 2023. The University nonetheless continued to withhold "any notes or data developed under the [CPSC] contract or documents that provide names of manufacturers or products that were used during the study." (*See* Letter from S. Robinson to B. Cox, et al., dated December 14, 2023, attached as Exh. 2). Namely, the University continues to improperly withhold the following categories of documents responsive to the Subpoena:

- Communications between Dr. Mannen and the CPSC, including but not limited to, "progress updates" provided to the CPSC as discussed on page 70 of the 2019 CPSC Report (*See* Exh. 3), which likely contain her "notes or data";

- All raw and unprocessed data from the 2019 CPSC Report, including, but not limited to: contact area data, EMG readings, kinematic data using marker-based motion capture, data from pressure-mapping sensors, oxygen saturation levels, heartbeat data, all photographs and videotapes, the 91 CPSC incident reports provided by the CPSC, all notes or spreadsheets drafted, prepared, or maintained by Dr. Mannen or other University employees regarding the 91 CPSC incident reports;

- All raw and unprocessed data from the 2020 Wang et al. study;

- All raw and unprocessed data from the 2021 Wang et al. study; and

- All other notes prepared by Dr. Mannen or her team at the University as it relates to the Studies.

12

## JURISDICTION AND STANDARD

"As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things or to permit an inspection." Fed. R. Civ. P. 34(c). A nonparty responding to a request for production under Rule 45 "must produce material in its possession, custody, or control, to the extent such material is otherwise relevant and discoverable." *Dinosaur Merch. Bank Ltd. v. Bancservices Int'l LLC*, No. 19-CV-84-ACL, 2021 U.S. Dist. LEXIS 47226, 2021 WL 918189, at *2 (E.D. Mo. March 10, 2021) (citing Fed. R. Civ. P. 45(a)(1)(iii)).

This Court has jurisdiction to enforce the subject Subpoena because it is located in the district where compliance with the Subpoena is required—that is, the district where the University is located. *See* Fed. R. Civ. P. 45(d); *see also XTO Energy, Inc. v. ATD, LLC*, No. 14-1021 JB/SCY, 2016 U.S. Dist. LEXIS 57050, 2016 WL 1730171, at *20 (D.N.M. Apr. 1, 2016) ("[M]otions to . . . enforce a subpoena can be brought in the district where compliance is required—i.e., the district in which the subpoena's recipient resides or works[.])."

## ARGUMENT

### I.     The Requested Materials Are Relevant and Discoverable, and The University Does Not Dispute This Point.

It is well settled that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ... [or which] appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(l). The purpose of this liberal discovery standard is to "make a trial less a game of blindman's bluff and more of a fair contest with the basic issues and facts disclosed to the fullest practical extent." *United States v. Proctor & Gamble, Co.*, 356 U.S. 677, 682 (1958). "Relevant information includes any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the

case." *Burton v. Valmet, Inc.*, No. 4:13-cv-00073 KGB, 2015 U.S. Dist. LEXIS 183459, at *8 (E.D. Ark. Feb. 24, 2015).

Here, there is no dispute and no question about the relevance or discoverability of the material that Petitioners seek. By Dr. Mannen's own admission in her *Colon* expert report, she is relying on the methodology, results, and conclusions of her Studies to support her opinions. (*See, e.g.* Mannen Report, Exh. 5, at 3 ("The methodology and results of my in vivo biomechanics study were therefore used in forming my opinions described in this report."); *id.* at 20 ("the conclusions related to the in vivo biomechanics study for this product apply to this specific case.")). It is well-established that defendants are entitled to discovery as to "the facts or data considered by the [plaintiffs' expert] witness in forming" her opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). The materials sought by the Subpoena are at the core of Dr. Mannen's methodology and data that form the bases for her opinions in the *Colon* case. That the University has not objected to the Subpoena on relevance grounds demonstrates that there is no dispute that the materials are discoverable under Rule 26.

## II.   The University Has Not Met Its Burden to Establish that the Requested Materials are Confidential.

The University objects to producing the requested materials on the grounds that they are confidential under Fed. R. Civ. P. 45(d)(3)(B)(i), which provides that a court may "protect a person subject to or affected by a subpoena, . . . if it requires disclosing a trade secret or other confidential research, development, or commercial information." (*See* Exh. 16 (September 27, 2023 Correspondence); Exh. 2 (December 14, 2023 Correspondence)). The University bears the burden to establish that the materials requested are confidential. *See, e.g. Dish Network, L.L.C. v. WNET*, Civil Action No. 13-cv-00832-PAB-KLM, 2014 U.S. Dist. LEXIS 57281, at *8 (D. Colo. Apr. 24, 2014) ("In cases where subpoenas are served on a non-party, the non-party has the burden of

showing that the requested information is confidential commercial information."); *Scientific Games Corp. v. AGS LLC*, No. 2:17-cv-00343-JAD-NJK, 2017 U.S. Dist. LEXIS 136592, at *4 (D. Nev. Aug. 24, 2017) ("[T]he party resisting discovery bears the initial burden of establishing that the information at issue is protected as a trade secret or confidential commercial information."). This burden "cannot be satisfied with conclusory statements." *Adams v. TDC Gen. Contrs. LLC*, No. 4:22-cv-04110, 2023 U.S. Dist. LEXIS 179306, at *2 (W.D. Ark. Oct. 4, 2023).

Here, the University has done nothing to establish why the requested materials are confidential under Fed. R. Civ. P. 45(d)(3)(B)(i). The only support provided by the University is the assertion that there is an agreement between the University and the CPSC to maintain the material confidentially and that the CPSC will not consent to the University disclosing the confidential material. This is not enough to meet the University's burden of showing the requested materials are confidential. *See, e.g., Baxter Int'l, Inc. v. Abbott Lab.*, 297 F.3d 544, 547 (7th Cir. 2002) (rejecting parties' contention "that the document must be kept confidential because we say so"); *Solar X Eyewear, LLC v. Bowyer*, No. 1:11-cv-763, 2011 U.S. Dist. LEXIS 100421, at *4 (N.D. Ohio Sep. 7, 2011) (holding that "merely alleging potential disclosures of trade secrets [does not] adequately justif[y] the imposition of a protective order").

To the extent courts have preserved confidentiality of academic research, they have done so in completely different contexts where the research at issue was not being used by the researcher as an expert witness. *See, e.g., Richards of Rockford, Inc. v. PG&E*, 71 F.R.D. 388, 390 (N.D. Cal. 1976) (holding that academic researchers, who were not experts in the case, were not required to produce confidential sources because the researchers were third parties to the case, the research project was not initiated for the lawsuit but involved research about questions of public policy, the events at issue in the case were not the focus of the research project and the factual issues presented

by the lawsuit could be resolved without resort to the confidential information, which was merely supplementary); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (same). Indeed, such cases have been distinguished when, as here, the researcher seeks to use the underlying research as an expert witness. For instance, in *I-Enterprise Co. v. Draper Fisher Jurvetson Mgt. Co.*, No. C-03-01561 MMC (EDL), 2005 U.S. Dist. LEXIS 57817, at *19 (N.D. Cal. Sep. 15, 2005), the Court distinguished *Richards* in granting a motion to compel an expert's underlying purportedly confidential research, reasoning as follows:

> *Richards* does not aid Professor Gompers and is factually distinguishable in all key respects. While there are good reasons to extend a qualified privilege to purely academic researchers whom a party seeks to draft involuntarily into its litigation wars, that situation is a far cry from academics who choose to serve as paid experts and voluntarily base their opinions in part on confidential research. Academic freedom can be preserved by academics foregoing such non-academic roles, or at least confining their opinions to those based on non-confidential research. No court has endorsed the remedy proposed here of shielding from the opposing party the material relied upon by the hired expert as a sword in the name of academic freedom.

*Id.*

The *I-Enterprise* court's reasoning applies to this case. Dr. Mannen's decision to heavily rely on her academic Studies for her expert opinions against Petitioners renders any protections afforded to her academic research a nullity. The Court should, therefore, compel the production of Dr. Mannen's confidential data, notes, and communications from her Studies notwithstanding the University's objection under Fed. R. Civ. P. 45(d)(3)(B)(i).

The University also contends that the requested materials are confidential under 15 U.S.C. § 2055 and that it does not have consent from the CPSC to produce the materials. (*See* Exh. 2 (December 14, 2023 Correspondence)). However, the University does not have standing to assert this argument, as this statute only "regulates the 'public disclosure' of information by the [CPSC]."

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 105 (1980). Indeed, the statute provides that its provisions only apply to "information that is to be disclosed by the [CPSC], any member of the [CPSC], or any employee, agent, or representative of the [CPSC] in an official capacity." 15 U.S.C. § 2055(d)(2). Here, the custodian of the respondent to the subpoena is not the CPSC, but the University, which cannot purport to be a member, employee, agent, or representative of the CPSC "in an official capacity." The University is, at best, an independent contractor of the CPSC. (*See* CPSC Contract w/ Univ. Ark., at 1, Exh. 18 (identifying the University as a "contractor")).

Regardless, even if the University did have standing to assert the protections under this statute, the withheld material does not fall under the scope of its protections. The statute provides that "[a]ll information reported to or otherwise obtained by the [CPSC] or its representative . . . which information contains or relates to a trade secret or [commercial or financial information] shall be considered confidential and shall not be disclosed." 15 U.S.C. § 2055(a)(2). "Confidential commercial information is information which, if disclosed, would cause substantial economic harm to the competitive position of the entity from whom the information was obtained." *Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 697 (D. Nev. 1994). Furthermore, a party must "demonstrate by competent evidence" that the information it is seeking to protect is a trade secret, which would be harmful if disclosed. *Upjohn Co. v. Hygieia Biological Labs.*, 151 F.R.D. 355, 358 (E.D. Cal. 1993). As discussed above, the University has done nothing (much less provide competent evidence) to demonstrate that the withheld material contains "trade secrets" or otherwise sensitive commercial information that can be harmful if disclosed. And to the extent the University's concern stems from the disclosure of the identities of testing participants or the

manufacturers' products used during testing, limited redactions can be made so as to still permit Petitioners to obtain the responsive material.

Neither Fed. R. Civ. P. 45(d)(3)(B)(i) nor 15 U.S.C. § 2055 justify the University's improper withholding of the material responsive to Petitioners' Subpoena. The Court should, therefore, compel the production of the withheld material.

**III.   Petitioners Have a Substantial Need for The Requested Materials.**

Even if the Court finds that the withheld materials qualify as confidential under Fed. R. Civ. P. 45(d)(3)(B)(i) or 15 U.S.C. § 2055, it should still compel their production because Petitioners have a substantial need for them.  Dr. Mannen's **choice** to serve as a retained expert witness in the *Colon* case subjects her to the Federal Rules of Civil Procedure and Federal Rules of Evidence, which **require** her to produce her underlying data—despite whatever claim of confidentiality may have existed **before Dr. Mannen became a retained expert in litigation involving the Rock 'n Play Sleeper**. Simply put, Dr. Mannen cannot hide behind her contract with the CSPC that was in effect **before** she became an expert to preclude Petitioners from assessing her underlying data. *See I-Enterprise Co,* No. C-03-01561 MMC (EDL), 2005 U.S. Dist. LEXIS 57817, at *19. Doing so would essentially mean that plaintiffs could retain Dr. Mannen and other experts like her, who base their opinions on purportedly confidential research, to ensure that the defendants' ability to assess their opinions are crippled.  This tactic effectively strips Petitioners of their rights under Fed. R. Civ. P. 26 and Fed. R. Evid. 702.

To protect against this very type of prejudice and gamesmanship, federal courts have held that "Rule 45 should be read in conjunction with the limitations of discovery found in Rules 26 and 34 of the Federal Rules of Civil Procedure," and thus "the court must balance the burden of production against the need for the requested documents." *BSN Medical, Inc. v. Parker Medical Associates, LLC,* 2011 U.S. Dist. LEXIS 4833, 2011 WL 197217 at *2 (S.D.N.Y. Jan. 19, 2011).

*Universal Del., Inc. v. Comidata Network, Inc.*, Case No. 10-mc-104, 2011 U.S. Dist. LEXIS

28963, 2011 WL 1085180 (M.D. Tenn. Mar. 21, 2011) is instructive in this regard. The *Universal*

court explained:

> In striking the balance, courts commonly undertake a three-prong inquiry. Initially, the court considers whether the party (or nonparty) seeking protection has shown that the information sought is a trade secret or otherwise confidential, and shown that its disclosure might be harmful. If so, the court looks to whether the party seeking the discovery has established that the information is relevant and necessary to the underlying action. Finally, if those two inquiries are answered in the affirmative, the court then balances the need for discovery of the information against the alleged injury which will result from disclosure.

*Universal Del., Inc. v. Comidata Network, Inc.*, Case No. 10-mc-104, 2011 U.S. Dist. LEXIS

28963, 2011 WL 1085180, at *3 (M.D. Tenn. Mar. 21, 2011). *See also A Major Difference, Inc.*

*v. Wellspring Products, LLC*, 243 F.R.D. 415, 416-17 (D. Colo. 2006); *Spartanburg Reg.*

*Healthcare, Sys. v. Hillenbrand Indus., Inc.*, 2005 U.S. Dist. LEXIS 30594, 2005 WL 2045818 at

**2-3 (W.D. Mich. 2005); *Mannington Mills v. Armstrong World Indus., Inc.*, 206 F.R.D. 525,

528-29 (D. Del. 2002).

As mentioned above, any concerns of confidentiality regarding the requested materials are

substantially outweighed by the probative value of their production because it is necessary for

Petitioners to fully assess and evaluate Dr. Mannen's methodology and conclusions, which she has

placed "squarely at issue" in the *Colon* case. *See, e.g., Longoria v. Kodiak Concepts LLC*, No. CV-

18-02334-PHX-DWL, 2021 WL 1100373, at *14 (D. Ariz. Mar. 23, 2021) ("In short, Defendant

should have produced the contracts on which [its expert] relied, notwithstanding their

'confidential' nature. Because [the expert] chose to base his opinions on those contracts, he placed

them squarely at issue."). Dr. Mannen's report in *Colon* unabashedly incorporates by reference

and adopts the methodology, results, and conclusions from her Studies. (*See, e.g.*, Mannen Report,

Exh. 5, at 3 ("[T]he Fisher Price Rock 'n Play Sleeper product is functionally equivalent to inclined sleep products that were tested in my previous human subjects biomechanics study, meaning the results of that robust and peer-reviewed research apply to this specific case."); *id.* ("The methodology and results of my *in vivo* biomechanics study were therefore used in forming my opinions described in this report."); *id.* at 20 ("the conclusions related to the *in vivo* biomechanics study for this product apply to this specific case.")). Dr. Mannen's position (and by extension, the University's position) of preventing Petitioners from obtaining the underlying data, notes, and other material that they would otherwise be entitled to receive under the federal rules merely because they are confidential is untenable and has been rejected by numerous courts. *See, e.g., Velali v. Yale Univ.*, 2020 WL 5790443, at \*1 (D. Conn. 2020) ("The disclosure obligation extends to . . . information explicitly relied upon in an expert report irrespective of claims of confidentiality. Where an expert acknowledges relying on or otherwise considering facts or data in forming an opinion, that material has been placed directly in issue.") (citations and quotation marks omitted); *U.S. Surgical Corp. v. Orris, Inc.*, 983 F. Supp. 963, 970 (D. Kan. 1997) ("[P]laintiff should not be able to conduct a survey for litigation and subsequently protect the survey from scrutiny by promising confidentiality to the participants. Plaintiff has placed the survey's underlying data directly in issue . . . [and] defendants' need to properly evaluate and rebut the reliability of the survey outweigh[s] plaintiff's interest in shielding the survey participants."); *City of Owensboro v. Ky. Utils. Co.*, 2008 WL 4542674, \*2-3 (W.D. Ky. 2008) (granting motion to exclude expert from testifying, where the expert based his opinion on "confidential" documents that were never produced in unredacted form to the opposing party, because the failure to produce the documents in unredacted form "deprived [the opposing party] of the opportunity to determine

whether the unidentified plants are comparable . . . and, ultimately, to test the accuracy and validity of [the expert's] similar plant data").

Petitioners would continue to be prejudiced if Dr. Mannen is allowed to hide behind her contract with the CPSC before she became an expert in the *Colon* case to prevent production of data she would otherwise be required to produce in that expert role. As the *Longoria* court stated, her choice to become an expert has now put her data and other materials "squarely at issue" in the *Colon* case, and Petitioners (and their experts) are entitled to analyze the data and methodology underlying her expert conclusions. No. CV-18-02334-PHX-DWL, 2021 WL 1100373, at *14.

## IV.     Any Alleged Confidentiality Concerns Are Resolved by the *Colon* Protective Order, Which Allows for the Requested Materials to be Kept Confidential.

To the extent the Court finds that the materials requested are confidential and such confidentiality is not outweighed by their probative value, it should still compel their production under the Confidentiality and Protective Order in the *Colon* case (the "Protective Order") (*Colon* Protective Order, Exh. 19). Indeed, the Protective Order is designed to shield such confidential material from the public eye and provides that any

> Party or ***non-party*** may designate as "Confidential" any Litigation Material that the Producing Party (or counsel) reasonably and in good faith believes to be confidential, including, but not limited to, the following documents and tangible things produced or otherwise exchanged: (1) personal, financial, medical and/or other sensitive and/or confidential consumer information; (2) commercial, proprietary, or other information that is non-public and sensitive in nature; and (3) trade secrets, research, development, customer lists, personally identifiable information, or commercially sensitive business or financial information, the disclosure of which would cause proprietary, competitive, or economic harm.

(*Id.* at ¶ 3) (emphasis added).

Material designated as "Confidential" under the Protective Order will be maintained in confidence by the Parties and shall not be disclosed to any other person, except (1) the Court, (2)

the Parties, (3) the Parties' counsel, (4) mediators, (5) expert witnesses, (6) mock jurors, and (7) deponents and witnesses (subject to some additional restrictions). (*See id.* at ¶ 4).

"The existence of a confidentiality or protective order can be grounds for a court to decline a motion to quash or modify a subpoena, made on the basis that trade secrets or other information covered by Rule 45(d)(3)(B)(i) is sought." *StoneEagle Servs. v. UMB Bank, N.A.*, No. 4:15-mc-0904-NKL, 2015 U.S. Dist. LEXIS 66863, at *10 (W.D. Mo. May 22, 2015). Indeed, courts routinely overrule objections and deny motions to quash subpoenas on the grounds of confidentiality when, as in this case (and other cases in which Dr. Mannen has been disclosed as an expert), there is a protective order in effect under which the material may be designated as "confidential." *See, e.g., Cave v. Thurston*, No. 4:18-cv-00342-KGB, 2022 U.S. Dist. LEXIS 179202, at *63 (E.D. Ark. Sep. 30, 2022) (compelling production of confidential government material in light of a protective order in effect in the case); *In re New Eng. Compounding Pharmacy, Inc.*, No. MDL No. 13-2419-FDS, 2013 U.S. Dist. LEXIS 161652, at *46 (D. Mass. Nov. 13, 2013) (overruling objections based in confidentiality in response to subpoenas); *The Hunte Corp. v. Martinelli*, 2010 U.S. Dist. LEXIS 122863, 2010 WL 4813849 (W.D. Mo. Nov. 19, 2010) (where non-party argued subpoena sought trade secrets and other proprietary information, court declined to quash because a confidentiality order existed in the underlying action); *Widevoice Communs. v. Qwest Communs. Co.*, No. 2:12-cv-00467-GMN-VCF, 2012 U.S. Dist. LEXIS 58248, at *12 (D. Nev. Apr. 26, 2012) (ordering non-party to "produce all documents as agreed to, including those deemed confidential or proprietary, and designate them either 'Confidential' or 'Attorneys' Eyes Only' as applicable").

Thus, the University's and the CPSC's claim that the materials are confidential and cannot be produced are belied by the *Colon* Protective Order, which includes a detailed procedure by

which the requested materials will remain confidential. The Court should compel the production of the requested materials on this basis as well.

## CONCLUSION

The University's objections to the Subpoena for Dr. Mannen's underlying data and other materials are unsubstantiated. For the foregoing reasons, Petitioners respectfully request the Court order the University to comply with the Subpoena and produce all responsive materials.

This 15th Day of February, 2024.

Respectfully Submitted,

Grant E. Fortson (Ark. Bar No. 92148)
**LAX, VAUGHAN, FORTSON, ROWE & THREET, P.A.**
11300 Cantrell Road, Suite 201
Little Rock, AR 72212
gfortson@laxvaughan.com,
(501) 907-5443

and

Lori G. Cohen (*pro hac vice forthcoming*)
Brandon D. Cox (*pro hac vice forthcoming*)
Bardia Sergent (*pro hac vice forthcoming*)
R. Brady Herman (*pro hac vice forthcoming*)
**GREENBERG TRAURIG, LLP**
The Terminus
3333 Piedmont Road, N.E.
Suite 2500
Atlanta, GA 30305
Tel.: (678) 553-2100
Fax: (678) 553-2212
Email: cohenl@gtlaw.com
Email: coxb@gtlaw.com
Email: sergentb@gtlaw.com
Email: hermanb@gtlaw.com

*Counsel for Fisher-Price, Inc. and Mattel, Inc.*

## CERTIFICATE OF SERVICE

I, Grant E. Fortson, hereby certify that on February 15, 2024, I served a true and correct copy of the foregoing via U.S. Mail, certified and return receipt requested, as well as electronic mail, upon the following:

Sherri L. Robinson
Associate General Counsel
Office of General Counsel
University of Arkansas for Medical Sciences
4301 W. Markham St., #860
Little Rock, AR 72205-7199
Main: 501-686-7964; Mitel: 10648
Email: SLRobinson@UAMS.edu


With a courtesy copy sent via electronic mail to Counsel for Plaintiffs in the underlying case pending in the United States District Court for the District of Massachusetts captioned *Colon, et al. v. Fisher-Price, Inc., et al.*, Civil Action No. 1:22-cv-10984:

Leo v. Boyle
Peter J. Ainsworth
Robert F. Foster
Meehan, Boule, Black, & Bogdanow, P.C.
100 Cambridge Street, Suite 2101
Boston, MA 02114
Tel.: (617) 523-8300
Email: lboyle@meehanboyle.com
Email: painsworth@meehanboyle.com
Email: rfoster@meehanboyle.com

Grant E. Fortson
*Counsel for Fisher-Price, Inc. and Mattel, Inc.*

24